# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**ZURICH AMERICAN INSURANCE COMPANY,**

     **Plaintiff,**

         **v.**

**UIP COMPANIES LLC et al.,**

     **Defendants.**
_____

)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No. 19-cv-1818 (APM)**

## MEMORANDUM OPINION

## I.    INTRODUCTION

In this declaratory judgment action, Zurich American Insurance Company ("Zurich") seeks a declaration that it is not obligated to provide insurance coverage to Defendants UIP Companies LLC, its principals Steven F. Schwat, Peter J. Bonnell, and Stephen E. Cox, and the holding company Schwat Realty LLC (collectively, "UIP") due to UIP's alleged failure to provide Zurich with timely notice of their claim. UIP has filed a counterclaim for breach of contract against Zurich, which is premised on Zurich's denial of coverage for the same claim.

Zurich now moves for summary judgment. For the reasons that follow, the court grants Zurich's motion for summary judgment and dismisses UIP's counterclaim.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *Underlying Dispute*

This case comes before the court after a protracted and ongoing dispute between UIP's principals and Marion Coster, the wife of the late Wout Coster, who was one of UIP's original

partners.  *See* Pl.'s Mot. for Summ. J., ECF No. 25 [hereinafter Pl.'s Mot.], Pl.'s Stmt. of Material Undisputed Facts, ECF No. 25-2 [hereinafter Pl.'s Facts], ¶¶ 2, 5, 6.  Prior to Wout Coster's death, he and UIP's principals, Peter Bonnell, Heath Wilkinson, and Steven Schwat devised a final term sheet, dated April 11, 2014, that laid out the framework for an agreement that would redistribute their ownership stakes in UIP.  *See* Pl.'s Facts ¶ 4; Defs.' Opp'n to Pl.'s Mot. for Summ. J., ECF No. 27 [hereinafter Defs.' Opp'n], Defs.' Resp. to Pl.'s Stmt. of Material Undisputed Facts & Add'l Undisputed Material Facts, ECF No. 27-1 [hereinafter Defs.' Facts], ¶ 34; Pl.'s Mot., Ex. B, ECF No. 25-5.  Before the parties could execute a final agreement, however, Wout Coster passed away in April 2015.  *See* Pl.'s Reply Mem. of P. & A. in Further Supp. of Pl.'s Mot. for Summ. J., ECF No. 28 [hereinafter Pl.'s Reply Br.], Pl.'s Resp. to Defs.' Stmt. of Add'l Undisputed Material Facts [hereinafter Pl.'s Reply Facts], ¶ 35; Defs.' Facts ¶ 35.  Marion Coster inherited Wout Coster's equity interest in UIP and his entitlement to certain "promotes," or shares, of the business. *See* Defs.' Facts ¶ 36.

A few months after Wout Coster's death, Robert Gottlieb, who was representing Wout Coster's estate, contacted Schwat about the "next steps" for reorganizing the principals' ownership stakes, as the principals had discussed in the April 2014 term sheet.  Defs.' Opp'n, Ex. 15, ECF No. 27-16, at 2.[1]  Over the course of the summer, Marion Coster, along with Gottlieb and Anne Pace (the executor of Wout Coster's estate), Michael Pace (Anne Pace's husband), and Michael Rinaldi (Marion Coster's accountant) engaged in active discussions with UIP's leadership regarding how the company should move forward following Wout Coster's death and how to fairly compensate Marion Coster.  *See* Defs.' Facts ¶¶ 40–41, 43–46.

---

[1] For simplicity, the court uses PDF pagination for all exhibits.

Over the course of such discussions, however, Marion Coster began to believe, to her displeasure, that UIP had been operating as if the term sheet had been finalized and Wout Coster had executed an agreement relinquishing some of his ownership stake and power in the company. *See, e.g.*, Pl.'s Mot., Ex. E, ECF No. 25-8 (Michael Pace arguing that, "[u]nless there exists a binding document where Wout abdicated his right to a 50% voice in the operating companies, as 50% owner the estate has not only a right but an obligation to have a say in how this 'excess' was and continues to be spent"); Defs.' Opp'n, Ex. 11, ECF No. 27-12, at 2 (Michael Pace "rais[ing] questions about Wout's ownership interests in the UIP operating companies").  Indeed, Bonnell explained to Marion Coster that the provisions in the term sheet should govern their relationship: "We (Wout, me, Heath and Steve) came to the agreement represented in the term sheet that we all signed . . . . The agreement proves what I have been saying and the agreement is what Wout agreed to, not on his death bed, but almost a year before that, when he was relatively healthy."  Pl.'s Mot., Ex. G, ECF No. 25-10, at 2–3.  The legal effect of the term sheet became a sticking point for the parties' negotiations.

### 2.    The Purported Claims

As negotiations drew on, UIP received three communications from Marion Coster and her representatives that Zurich argues required UIP to notify it of the dispute.  The first is an August 17, 2017 letter from Michael K. Ross—an attorney at Aegis Law Group LLP representing Marion Coster—that was addressed to Schwat, Bonnell, and Wilkinson (the "August 17, 2017 Letter"). Pl.'s Mot., Ex. H, ECF No. 25-11, at 2.  The letter (1) enclosed independent valuations of UIP, (2) disagreed that the 2014 term sheet was an enforceable contract, and (3) requested records and information from UIP, including "detailed accounting[s]" of several of Wout Coster's interests. *Id.* at 2, 4–5.  Ross informed UIP that Marion Coster was seeking information to guide her decision

to enter "a potential buyout of her equity interests in the UIP Companies or . . . to assume or delegate a representative to assume her rightful role in the UIP Companies." *Id.* at 5. Ross also requested a meeting with UIP's legal counsel. *Id.*

Two months later, on October 11, 2017, Marion Coster sent UIP a follow-on letter, seeking to review certain UIP books and records (the "October 11, 2017 Letter"). *See* Pl.'s Mot., Ex. K, ECF No. 25-14, at 2.[2] The letter reminded UIP that "Mrs. Coster is the beneficial owner of fifty-percent of the Company as well as 50% of" UIP's various related entities. *Id.* at 3. "Nevertheless," the letter continued, "neither Mrs. Coster nor her representatives have been consulted about—or even apprised of—significant operational matters concerning the UIP Companies." *Id.* Marion Coster also noted that she had "received no profit distributions from any of the UIP Companies since Mr. Coster's passing, despite the evident success of those entities collectively." *Id.*

Finally, on February 15, 2018, Ross, Marion Coster's attorney, sent an email to UIP's counsel, Deborah Baum, a civil litigator, bearing the subject "Inadmissible Settlement Communication – For Settlement Purposes Only" (the "February 15, 2018 Email"). Pl.'s Mot., Ex. O, ECF No. 25-18 [hereinafter Feb. 15, 2018 Email], at 2. The email provided the "terms under which Mrs. Coster . . . is willing to enter a global resolution of the current situation involving the UIP Companies and Messrs. Schwat, Bonnell, and Wilkinson." *Id.* Ross informed UIP that it was his client's view that "either an agreement needs to be reached under which Mrs. Coster receives fair value of her 50% equity ownership in the UIP Companies, or she (or her designee) will need to fully participate in the management of the UIP Companies." *Id.* Accordingly, Ross proposed two "frameworks" under which Marion Coster would relinquish her interest and "full[y]

---

[2] Marion Coster also sent similar letters to UIP Asset Management, Inc., Pl.'s Facts ¶ 17; UIP Property Management, Inc., *id.* ¶ 20; and UIP General Contracting, *id.* ¶ 23.

release" all claims against UIP.  *Id.*   Under "Framework A," Marion Coster would receive $3,681,000 for her 50% ownership stake and would continue to receive payments on certain promotes and earn 39% of total payouts from certain deals documented in the term sheet.  *Id.*  Under "Framework B," Marion Coster was "willing to enter a global resolution of claims for past events and to relinquish her equity interests in the three UIP Companies."  *Id.*  She would be paid $1.25 million in exchange for her equity interest, and Bonnell would "reimburse" her for certain payouts of past promotes that he had received.  *Id.* at 3.  In addition, she would be paid "$300,000 within one year as compensation for lost dividends/distributions/management involvement with regard to the UIP Companies since Mr. Coster's death."  *Id.*  Finally, UIP would pay Marion Coster's health insurance premiums for her lifetime.  *Id.*  Ross concluded the email by stating: "For avoidance of doubt, any settlement between the parties will not be binding or effective unless and until a settlement agreement is fully executed by all parties."  *Id.*

On March 2, 2018, Baum, counsel for UIP, responded, "I am sure you are not surprised to hear that the proposal, as crafted, is unacceptable to Messrs. Bonnell and Wilkinson."  Pl.'s Mot., Ex. P, ECF No. 25-19, at 2.  The email did not provide a counteroffer and instead "describe[d] some over-arching issues [UIP had] with [Marion Coster's] broader analysis."  *Id.*  "We are not going to be able to reach any amicable agreement if it is to be based on the valuations that you provided," Baum wrote, also referencing "a major disconnect" between Marion Coster's understanding of UIP's ownership structure and the 2014 term sheet.  *Id.* at 2–3.  Negotiations faltered thereafter, with Ross writing back, "Regrettably, [your email] was not at all helpful in moving towards an amicable resolution . . . ."  Pl.'s Mot., Ex. Q, ECF No. 25-20, at 2.[3]

---

[3] Although the email in Exhibit Q is addressed to "Michael K. Ross," *see* Pl.'s Mot., Ex. Q, 25-20, at 2, Plaintiff has averred that the email was sent "from Michael Ross to Deborah Baum" and "was identified and authenticated at the Bonnell Deposition" as an email to Baum.  Pl.'s Mot., Decl. of Andrew L. Margulis, ECF No. 25-3, ¶ 19.

>    3.    *Marion Coster Sues UIP*

Marion Coster subsequently filed three lawsuits against UIP and its principals.  The first lawsuit, filed in the Delaware Court of Chancery on June 15, 2018, sought appointment of an independent custodian to manage the company (the "Custodian Action").  *See* Pl.'s Mot., Ex. S, ECF No. 25-22 [hereinafter Custodian Action Compl.], at 13.  In brief, the lawsuit alleged that Marion Coster "is a 50% stockholder" in UIP, who "has been denied any distributions from the Company since 2015, the year her husband, a founder, died." *Id.* ¶ 2.  The complaint also alleged that "Schwat has further prevented Mrs. Coster from gaining a meaningful view into the Company's financial affairs, and has barred her from any representation on the Board." *Id.*  The Custodian Action sought the appointment of a custodian, as well as attorneys' fees, expenses, and costs. *Id.* at 13–14.

The second lawsuit, also filed in the Delaware Court of Chancery on August 22, 2018, sought cancellation of stocks issued to Bonnell and the creation of a constructive trust (the "Stock Action").  Pl.'s Mot., Ex. T, ECF No. 25-23 [hereinafter Stock Action Compl.], at 13.  In that lawsuit, Marion Coster alleged that "Schwat has resisted all efforts by Mrs. Coster to achieve meaningful representation on the Board," and that, in an effort to subvert the Custodian Action, the UIP Board "purport[ed] to dilute Mrs. Coster's ownership interest" by selling shares to Bonnell *after* she had filed the Custodian Action.  *Id.* ¶¶ 1–2; *see also id.* ¶¶ 24–26, 37.  The complaint also documented that Marion Coster had not received a salary or distributions since Wout Coster's death and that she had been thwarted in her attempts to "obtain more information about how the

business is being run." *Id.* ¶¶ 19–21.  The action sought equitable relief and attorneys' fees, expenses, and costs.  *Id.* at 13.[4]

Finally, on August 24, 2018, Marion Coster filed a third action, which is currently pending before this court, in which she alleges UIP and its principals breached their fiduciary duties, aided and abetted breaches of fiduciary duty, and engaged in a civil conspiracy.  *See* Pl.'s Mot., Ex. U, ECF No. 25-24 [hereinafter Federal Action Compl.], at 13–22.  The action claims that the defendants "engaged in a brazen and unlawful scheme to deny Mrs. Coster, an elderly widow, any financial remuneration from her 50% ownership [interest] in UIP, any role in the affairs and governance of UIP, and any real visibility into the considerable financial success of the Company." *Id.* ¶ 3.  Marion Coster again claims that she "has received no distributions, salary, bonuses, or other financial renumeration from UIP since Mr. Coster's death, despite her 50% ownership [interest] in the Company."  *Id.* ¶ 25.  The lawsuit seeks compensatory damages, attorneys' fees and costs, pre-judgment interest, and declaratory and injunctive relief.  *Id.* at 22–23.

### 4.    *UIP's Insurance Policies*

UIP's decision to seek insurance coverage for Marion Coster's lawsuits, including for legal fees and costs incurred, implicated two insurance policies issued by Zurich.  The first policy provided coverage to UIP from March 1, 2017, to March 1, 2018 (the "2017 Policy").  *See* Pl.'s Mot., Ryan Decl. Ex. E, ECF No. 25-49 [hereinafter 2017 Policy], at 8.  The second policy provided UIP coverage from March 1, 2018, to March 1, 2019 (the "2018 Policy"; collectively with the 2017 Policy, the "Policies").  *See* Pl.'s Mot., Ex. LL, ECF No. 25-41 [hereinafter 2018 Policy], at 8.  Other than the difference in the coverage periods, the two policies are substantively

---

[4] The Delaware Court of Chancery consolidated the Custodian Action and the Stock Action, Pl.'s Facts ¶ 38, and has since ruled in favor of UIP, Defs.' Opp'n at 31.

identical.  Pl.'s Mot., Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J., ECF No. 25-1

[hereinafter Pl.'s Br.], at 10 n.2.  Both policies are "claims-made" policies.  They provide coverage

on a claims-made-and-reported basis, which means that they "cover only claims first made against

the insureds during the policy period" or any extended reporting period.  2017 Policy at 8

(emphasis omitted); 2018 Policy at 8.

Several provisions of the Policies are particularly relevant to this dispute.  First, the Policies

expressly make timely notice a condition precedent to coverage:

> As a *condition precedent* to their rights under any Liability
> Coverage Part, the Insureds shall give to the Underwriter written
> notice of any Claim made against the Insureds *as soon as*
> *practicable* after an Executive Officer or an employee of the
> Company's office of general counsel, risk management or
> functionally equivalent departments, if any, first learns of such
> Claim, but *in no event later than (i) ninety (90) days after expiration*
> *of the Policy Period*, or (ii) the expiration of the Extended Reporting
> Period or Run-Off Coverage Period, if exercised.

2017 Policy at 21, art. VIII, § A.1 (emphasis added); 2018 Policy at 21, art. VIII, § A.1.  As

applicable to this dispute, the parties agree that the Policies require UIP to provide notice of a

Claim "as soon as practicable" and, in all circumstances, within 90 days after the policy period

expires.

Second, the Policies define a "Claim" to include, among other things, (1) "a written demand

against any Insured for monetary damages or non-monetary or injunctive relief commenced by the

Insured's receipt of such demand, including a written demand that the Insured toll or waive a

statute of limitations," and (2) "a civil proceeding against any Insured commenced by the service

of a complaint or similar pleading."  2017 Policy at 27, art. III, § A.1–2; 2018 Policy at 27, art. III,

§ A.1–2.  Thus, a Claim includes both certain pre-suit demands and any served litigation.

Third, the Policies provide coverage for UIP's "Wrongful Acts." A "Wrongful Act" encompasses "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the Insured Persons." 2017 Policy at 29, art. III, § J; 2018 Policy at 29, art. III, § J. The Policies treat all Claims that arise from "the same Wrongful Act" or "Interrelated Wrongful Acts" as "one Claim." 2017 Policy at 18, art. III, § D; 2018 Policy at 18, art. III, § D. Accordingly, any Claim that arises from the same Wrongful Act or Interrelated Wrongful Acts as another Claim "shall be deemed to be first made on the date the earliest of such Claims is first made against any Insured, regardless of whether such date is before or during the Policy Period." 2017 Policy at 18, art. III, § D; 2018 Policy at 18, art. III, § D.

Fourth and finally, the Policies insure UIP for its losses, which are defined as "the total amount the Insureds become legally obligated to pay on account of Claims made against them for Wrongful Acts for which coverage applies." 2017 Policy at 28, art. III, § E; 2018 Policy at 28, art. III, § E. Such amounts include "damages (including punitive, exemplary or multiple damages), judgments, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements, Defense Costs," and civil penalties under certain statutory frameworks. 2017 Policy at 28, art. III, § E; 2018 Policy at 28, art. III, § E.

5. *UIP's Notice to Zurich*

Recall, Marion Coster filed her third and final lawsuit against UIP on August 24, 2018. Over six months later, on March 8, 2019, UIP first gave notice to Zurich of its dispute with Marion Coster by forwarding copies of the three complaints. Pl.'s Facts ¶ 43. By that point, however, the three actions, especially the two now consolidated cases in Delaware, *see supra* note 4, had substantially progressed. In fact, at the time UIP gave notice, the court in Delaware had scheduled

a trial date for April 17, 2019.  *Id.* ¶ 50.  Shortly after providing notice, UIP advised Zurich that its attorneys had billed over $640,000 for the three cases.  *See id.* ¶¶ 56–58.

Following an investigation of UIP's Claim, Zurich eventually "denie[d] coverage in its entirety" and informed UIP that it would "neither defend nor indemnify [it] in connection with" Marion Coster's three lawsuits.  *See* Pl.'s Mot., Ex. KK, ECF No. 25-40, at 2–3.  Zurich offered two primary reasons that it would not provide coverage.  First, it determined that "UIP failed to provide notice of the [l]awsuits in accordance with the requirements of the 2018 Policy" because UIP did not give notice "as soon as practicable after the relevant UIP officers learned of such [l]awsuits."  *Id.* at 5.  Second, Zurich denied coverage because it concluded that "[t]he February 15, 2018 email was a 'Claim'" that "was first made during the Policy Period of the 2017 Policy."  *Id.* at 6.  It reasoned that "[t]he acts giving rise to the demands in the February 15, 2018 email are the same acts that are alleged in the [l]awsuits," and therefore, "as a condition precedent to coverage," UIP was required to give notice "no later than ninety (90) days after the expiration of the Policy Period of the 2017 Policy, making notice of the Claim required no later than May 30, 2018."  *Id.*  UIP did not provide notice until more than nine months later on March 8, 2019.  *Id.*

### B.    Procedural Background

The same day that Zurich denied coverage—June 21, 2019—it also filed this action seeking "a declaration that no coverage is available for any of the underlying lawsuits."  Compl., ECF No. 1, ¶ 2.[5]  UIP answered the Complaint and filed a Counterclaim alleging that Zurich breached the insurance policy by failing to provide coverage.  Answer & Counterclaim, ECF No. 12, at 1, 21. Following discovery, Zurich moved for summary judgment.  *See* Pl.'s Mot.

---

[5] The Complaint originally named Marion Coster as a defendant, but Zurich voluntarily dismissed her before she responded to the Complaint.  *See* Notice of Voluntary Dismissal of Def. Marion Coster Only, ECF No. 16.

## II.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In deciding a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"; its opposition must be "supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that a reasonable jury could find in its favor. *Elzeneiny*, 125 F. Supp. 3d at 28 (citing Fed. R. Civ. P. 56(e)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B.     Interpretation of Insurance Policy

Zurich's motion requires the court to interpret the insurance policies issued to UIP. "An insurance policy is a contract between the insured and the insurer . . . ." *Cameron v. USAA Prop. & Cas. Ins.*, 733 A.2d 965, 968 (D.C. 1999).[6] The District of Columbia "adheres to an objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they

---

[6] The parties assume that District of Columbia law applies, so the court does as well.

11

entered the contract, unless the written language is not susceptible of a clear and definite meaning." *Carlyle Inv. Mgmt., LLC v. Ace Am. Ins.*, 131 A.3d 886, 894–95 (D.C. 2016) (internal quotation marks omitted).   In "construing" the policy, the court "must first look to the language of the contract." *Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001) (internal quotation marks omitted).   The court "examine[s] the document on its face, giving the language used its plain meaning, unless, in context, it is evident that the terms have a technical or specialized meaning." *Carlyle Inv. Mgmt.*, 131 A.3d at 895 (internal quotation marks omitted).   "Where insurance contract language is not ambiguous[,] a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Travelers Indem.*, 770 A.2d at 986 (alteration omitted) (quoting *In re Corriea*, 719 A.2d 1234, 1239 (D.C. 1988)).

## III.   DISCUSSION

The Policies provide Zurich with a defense to coverage if UIP fails to provide timely notice of a Claim.   The Policies make it "a condition precedent" to coverage that UIP give "notice of any Claim" to Zurich "as soon as practicable after" a qualifying officer or employee "first learns of such Claim, but in no event later than (i) ninety (90) days after expiration of the Policy Period" or (ii) any extended reporting period.   *See* 2017 Policy at 21, art. VIII, § A.1; 2018 Policy at 21, art. VIII, § A.1.   In the District of Columbia, such "[n]otice provisions in insurance contracts are of the essence of the contract." *Diamond Serv. Co. v. Utica Mut. Ins.*, 476 A.2d 648, 652 (D.C. 1984).   Thus, where, as here, an insurance "policy expressly makes compliance with its terms a condition precedent to liability on the part of the insurer, failure to comply with the notice provision will release the insurer of liability on the policy." *Travelers Indem.*, 770 A.2d at 991 (alteration omitted) (quoting *Lee v. Travelers Ins.*, 184 A.2d 636, 638 (D.C. 1962)).

12

Zurich argues that it is excused from providing coverage for Marion Coster's lawsuits on the ground of untimely notice for two reasons.  First, it asserts that the August 17, 2017 Letter, the October 11, 2017 Letter, and the February 15, 2018 Email each gave rise to a "Claim" under the 2017 Policy; that each of those Claims is related to the subsequently filed lawsuits, thereby constituting a single Claim under the 2017 Policy; and that UIP's failure to provide Zurich notice of those Claims within the 90-day, post-Policy notice period, which expired on May 30, 2018, relieves Zurich from providing coverage for the lawsuits.  *See* Pl.'s Br. at 15–26.  Because the court finds that the February 15, 2018 Email meets the 2017 Policy's definition of a "Claim," the court does not decide whether the August 17, 2017 Letter and October 11, 2017 Letter are also Claims under the 2017 Policy.  The court also agrees that February 15, 2018 Email is sufficiently related to the later-filed lawsuits such that they comprise a single Claim, as to which UIP failed to give notice within the reporting period.

Separately, Zurich contends that, even if the court were to find that none of the above-listed communications constitutes a Claim, the three lawsuits unquestionably meet the definition of one.  *See id.* at 16–31.  As to those triggering events, UIP's notice still came too late.  According to Zurich, although UIP made a Claim within the 90-day post-Policy notice period, it was nevertheless untimely because the 2018 Policy required UIP to provide notice "as soon as practicable after" it learned of the lawsuits and yet UIP waited more than five months after the last of the lawsuits to supply notice.  The court agrees with Zurich.  UIP's Claim was untimely under the 2018 Policy.

The court begins its analysis with the 2017 Policy before turning to the 2018 Policy.

13

### A.    Notice of the February 15, 2018 Email Under the 2017 Policy

The February 15, 2018 Email's impact on coverage gives rise to three related inquiries. First, does the Email meet the 2017 Policy's definition of a "Claim"?  Second, if it is a Claim, is the February 15, 2018 Email sufficiently related to the three lawsuits for which UIP seeks coverage, such that those events are treated as a single, indivisible Claim under the 2017 Policy? Third, if those events constitute a single Claim, was UIP's notice timely under the 2017 Policy?

#### 1.    Whether the February 15, 2018 Email Is a Claim

The 2017 Policy defines a "Claim" to include "a written demand against any Insured for monetary damages or non-monetary or injunctive relief commenced by the Insured's receipt of such demand, including a written demand that the Insured toll or waive the statute of limitations." 2017 Policy at 27, art. III, § A.1.  Thus, the court must determine if the February 15, 2018 Email demands "monetary damages or non-monetary or injunctive relief."  *Id.*

Zurich argues that the February 15, 2018 Email is a "Claim" because it "demands . . . monetary damages and non-monetary relief" in exchange for a "full release of all claims."  Pl.'s Br. at 17–20 (emphasis omitted) (internal quotation marks omitted).  UIP disagrees for three reasons.  First, UIP argues that the "settlement demand" in the Email was merely a proposal to finalize UIP's efforts to acquire Marion Coster's 50% equity interest.  *See* Defs.' Opp'n at 22–23. Second, UIP argues that the Email was mislabeled a "Settlement Communication" and was merely one of a series of communications concerning a buyout of Marion Coster's interest.  *Id.*  Third, UIP argues that the February 15, 2018 Email cannot constitute a Claim because "[t]here was no threat that Mrs. Coster would seek court-ordered relief."  *Id.* at 23–25.

The court agrees with Zurich that the February 15, 2018 Email included, at least, a demand for monetary damages and therefore is a Claim under the 2017 Policy.  The February 15, 2018

Email seeks the payment of money to Marion Coster to satisfy a past injury.  *See* Feb. 15, 2018 Email at 2–3.  While many of Marion Coster's monetary demands undoubtedly relate to a buyout of her equity interests, both of the proffered settlement frameworks anticipate Marion Coster being compensated for UIP's failure to make certain other payments that she claimed her equity stake entitled her to.  Under "Framework A," Marion Coster would "receive 39% of total payouts on deals" that were identified in the 2014 term sheet.  *Id.* at 2.  Likewise, under "Framework B," Marion Coster would receive $300,000 "as compensation for lost dividends/distributions/ management involvement."  *Id.* at 3.  In fact, UIP itself characterized the demand under Framework B as "a reference to amounts [Marion] Coster claimed to be due and owing."  Defs.' Opp'n at 23.  Therefore, on its face, the February 15, 2018 Email demands monetary damages based on UIP's past conduct.  The Email thus plainly contradicts UIP's contention that the settlement offer merely memorializes the terms of an equity buyout.

Additionally, the content of the February 15, 2018 Email refutes UIP's contention that the Email did not actually contain a settlement offer or proposal for global resolution.  UIP argues that the Email's subject—"Inadmissible Settlement Communication – For Settlement Purposes Only," Feb. 15, 2018 Email at 2—instead referenced the parties' long history of "us[ing] terms like 'settlement' and 'global resolution' to describe their discussions" of a complex buyout framework.  Defs.' Opp'n at 18, 22.  The Email, however, supports a more capacious understanding of the term "global resolution" because Marion Coster sought to resolve two different disputes:  the appropriate price for her equity interest *and* the compensation that she claimed was due and owed because UIP failed to pay her certain amounts that her equity interest entitled her to.  *See* Feb. 15, 2018 Email at 2–3.  The words "global resolution," read in their context, therefore indicate that

Marion Coster was seeking to resolve both the buyout of her equity stake *and* a dispute over past unpaid compensation.

The court is also not persuaded by UIP's third argument—that a claim does not lie unless it threatens to seek court-ordered relief.  UIP relies on *St. Paul Mercury Insurance v. RMG Capital Corp.*, No. SACV 12-450-JST(MLGx), 2012 WL 2069677 (C.D. Cal. June 7, 2012), for the proposition that a communication is not a claim unless it "seek[s] court-ordered relief."  *See* Defs.' Opp'n at 23–24.  But *St. Paul Mercury Insurance* is inapplicable because that decision was based on the meaning of "non-monetary relief" rather than the "monetary damages" at issue here. In *St. Paul Mercury Insurance*, the California district court considered a policy that provided coverage for, among other things, "a 'written demand for non-monetary relief,'" and the court interpreted the term "relief" to mean "a court-ordered benefit."  *See* 2012 WL 2069677, at *3–4. The court held that "under the plain meaning of the Policy, a 'Claim' only includes a demand— i.e., a request for something as a matter of right or insistence on a course of action—for 'non- monetary relief' in the form of a court-ordered benefit."  *Id.* at *4.  In contrast, the court here rests its decision on Marion Coster's demand for monetary damages—not her request for non-monetary relief.  Therefore, *St. Paul Mercury Insurance* is inapposite, and UIP has not cited any authority to suggest that a claim for monetary damages must include a request for court-ordered damages.

Even if the court were to require some suggestion that Marion Coster intended to seek court-ordered damages, that requirement would be satisfied here.  First, as Zurich notes, the February 15, 2018 Email contains the header "Inadmissible Settlement Communication – For Settlement Purposes Only."  Feb. 15, 2018 Email at 2; *see also* Pl.'s Reply Br. at 12.  That header appears not once but twice on the first page of the Email.  Feb. 15, 2018 Email at 2.  The only reason for Marion Coster's attorney to include such language is if he anticipated that the dispute

could lead to litigation—otherwise, the email's admissibility as evidence would be irrelevant. Indeed, UIP's response to the February 15, 2018 Email suggests that both sides anticipated the possibility that a third party would be called upon to resolve the dispute.  In a March 2, 2018 email, counsel for UIP wrote, "We are not going to be able to reach any *amicable agreement* if it is to be based on the valuations that you provided."  Pl.'s Mot., Ex. P, ECF No. 25-19 [hereinafter Mar. 2, 2018 Response] (emphasis added).   Particularly in the context of litigious language like "inadmissible settlement communication," contemplating the possibility of a non-amicable resolution supports an inference that the parties understood the dispute might ultimately be resolved by a third party, such as a court or mediator.

> 2.   *Whether the February 15, 2018 Email and Marion Coster's Lawsuits Constitute a Single Claim Under the 2017 Policy*

The court next considers whether the February 15, 2018 Email and Marion Coster's three lawsuits constitute a single Claim under the 2017 Policy.  The court must address this issue because only if the Email and lawsuits are a single Claim would the failure to give timely notice of the Email defeat coverage for the later-filed lawsuits.  Put another way, if the February 15, 2018 Email and lawsuits are *not* related, and therefore are *separate* Claims, then the failure to give timely notice following the Email would not defeat coverage for the lawsuits if they were timely noticed.

The 2017 Policy provides that "[a]ll Claims . . . which arise out of the same Wrongful Act and all Interrelated Wrongful Acts of Insureds shall be deemed one Claim."  2017 Policy at 18, art. III, § D.  A "Wrongful Act" encompasses "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted" by the insured. *See id.* at 29, art. III, § J.  And in turn, an "Interrelated Wrongful Act" refers to "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."  *Id.* at 16,

17

art. II, § R.  Thus, Claims that arise from the same alleged action or series of actions are treated as one, and such a singular "Claim shall be deemed to be first made on the date the earliest of such Claims is first made against any Insured, regardless of whether such date is before or during the Policy Period."  *Id.* at 18, art. III, § D.  Accordingly, UIP's Claim—and thus its duty to provide notice—relates back to the first time the Claim was presented to UIP.  If the February 15, 2018 Email and Marion Coster's lawsuits implicate the same underlying wrongful acts, then the February 15, 2018 Email will serve as the trigger for UIP's duty to provide timely notice to Zurich of its Claim.

The February 15, 2018 Email and Marion Coster's lawsuits all arise from UIP's purported failure to honor Marion Coster's 50% ownership stake.  In the verified complaint in the Custodian Action, Marion Coster explained, "[s]he initiate[d] th[e] action because despite the apparent success of the Company in recent years, she has been denied any distributions from the Company since 2015, the year her husband, a founder, died" and has been prevented "from gaining a meaningful view into the Company's financial affairs" and barred "from any representation on the Board."  Custodian Action Compl. ¶ 2.  Likewise, in the Federal Action, filed in August 2018, Marion Coster alleges that "Defendants have engaged in a brazen and unlawful scheme to deny [her] . . . any financial renumeration from her 50% ownership in UIP, any role in the affairs and governance of UIP, and any real visibility into the considerable financial success of [UIP]."  Federal Action Compl. ¶ 3.  Finally, in the Stock Action, also filed in August 2018, she alleges that defendants Schwat, Bonnell, and Cox "took action to frustrate [her] efforts" in the Custodian Action "by issuing stock to Mr. Bonnell" and thereby "dilut[ing] [her] ownership interest."  Stock Action Compl. ¶ 2.  While the Stock Action therefore arose from actions taken *after* the Custodian Action and the February 15, 2018 Email, Marion Coster's allegations construe UIP's attempt to

18

dilute her ownership interest as a direct response to her attempts to exercise her equity stake. The conduct underlying the Stock Action is thus causally connected to UIP's alleged failure to honor Marion Coster's ownership stake.

Like the three lawsuits, the February 15, 2018 Email seeks to ensure that "Mrs. Coster receives fair value for her 50% equity ownership" or otherwise is allowed "to fully participate in the management of" UIP. Feb. 15, 2018 Email at 2. And as with Marion Coster's lawsuits, which alleged she had not received financial renumeration for her equity stake, both Framework A and Framework B include a demand for compensation for payments that Marion Coster claimed she was owed on account of her ownership stake. *See id.* (under Framework A, seeking "39% of total payouts on" "Past Promotes" from past deals listed on the term sheet); *id.* at 3 (under Framework B, seeking "$300,000 . . . as compensation for lost dividends/distributions/management involvement with regard to" UIP since her husband's death). The February 15, 2018 Email, like the three later-filed lawsuits, therefore arises from UIP's alleged failure to recognize and compensate Marion Coster in accordance with her purported ownership stake. On its face, the Email shares "a common nexus" of fact and "cause or series of causally connected facts" with the lawsuits. *See* 2017 Policy at 16, art. II, § R.

### 3. *Timely Notice*

Finally, the court must determine whether UIP gave Zurich timely notice of the Claim asserted in the February 15, 2018 Email. It did not, and UIP does not contend otherwise. Generally, the 2017 Policy requires UIP to give Zurich notice of a Claim "as soon as practicable after an Executive Officer or an employee of the Company's office of general counsel, risk management, or functionally equivalent departments, if any, first learns of such Claim." 2017 Policy at 21, art. VIII, § A.1. In no event, however, may UIP give notice "later than (i) ninety (90)

days after expiration of the Policy Period" or (ii) the expiration of any extended reporting period.
*See id.*

The requirement that Claims be made within 90 days from the 2017 Policy's expiration is implicated here. The 2017 Policy expired on March 1, 2018. *Id.* at 8. The deadline for UIP to have reported the February 15, 2018 Email was therefore May 30, 2018. The parties agree that UIP did not provide notice of a Claim to Zurich until March 8, 2019. *See* Pl.'s Br. at 25; Defs.' Opp'n at 4; Pl.'s Mot., Ryan Decl. Ex. A, ECF No. 25-45.[7] Accordingly, UIP did not give Zurich notice of its Claim until more than 90 days after the Policy's expiration date. Zurich therefore is not obligated to provide coverage to UIP for the three lawsuits brought by Marion Coster.

**B.   Notice of the Lawsuits Under the 2018 Policy**

*1.   Whether UIP Supplied Timely Notice of the Lawsuits*

Even if the February 15, 2018 Email is not a Claim under the 2017 Policy, the court would nonetheless find that UIP's notice was untimely because UIP did not give Zurich notice of the lawsuits "as soon as practicable" under the 2018 Policy. *See* 2018 Policy at 21, art. VIII, § A.1. Marion Coster's three lawsuits were filed in the summer of 2018: the Custodian Action was filed on June 15, 2018, *see* Custodian Action Compl. at 14; the Stock Action was filed on August 22,

---

[7] The February 15, 2018 Email is addressed to Baum, UIP's outside counsel. *See* Feb. 15, 2018 Email at 1. UIP, however, has not argued that an executive officer at UIP received notice of the Email at any time other than February 15, 2018—that is, UIP has not suggested that the trigger for UIP to provide notice based on the February 15, 2018 Email was later than February 15, 2018. This is consistent with other facts in the record. For example, UIP argued in its brief that Baum was hired "in a corporate capacity," suggesting she may have been serving as general counsel for UIP with respect to this matter. *See* Defs.' Opp'n at 28. Additionally, Bonnell, a member of UIP's Board of Directors, testified that he did not "have a specific recollection" of when he first saw the Email, but he "remember[ed] reading [it] in" the "time frame" around February 15, 2018. Pl.'s Br., Ex. C, Bonnell Dep. Tr., ECF No. 25-6, at 64:17–20. Bonnell also testified that he remembered having discussions with Schwat, the beneficial owner, president, and chairman of the Board of Directors of UIP, about whether to accept Marion Coster's settlement offer and chose not to accept because of her "misunderstanding" of the term sheet and the improper valuations that she relied on. *Id.* at 67:3–16. Both of those concerns were reflected in UIP's response to Marion Coster's attorney on March 2, 2018, *see* Mar. 2, 2018 Response, which suggests that Bonnell participated in discussions regarding Marion Coster's settlement offer before March 2, when UIP responded to the February 15, 2018 Email.

2018, *see* Stock Action Compl. at 14; and the Federal Action was filed on August 24, 2018, *see* Federal Action Compl. at 23.  UIP, however, did not give Zurich notice of the lawsuits until March 8, 2019—seven months after the third lawsuit was filed and almost nine months after the first lawsuit was filed.  *See* Pl.'s Mot., ECF No. 25-45, Ex. A; Pl.'s Br. at 25; Defs.' Opp'n at 4.

Under D.C. law, "[t]he words 'as soon as practicable' have uniformly been held to mean within a reasonable time in view of all the facts and circumstances of each particular case." *Greenway*, 307 A.2d at 755; *see also Diamond Serv. Co.*, 476 A.2d at 652.  To determine whether UIP gave Zurich notice within a reasonable time based on the circumstances of this case, the court turns to the three factors identified in *Starks v. North East Insurance*, 408 A.2d 980, 983–85 (D.C. 1979).  There, the D.C. Court of Appeals held that whether notice was given within a reasonable time depends on (1) what the insured could "reasonably have believed was [its] obligation under the insurance policy," (2) what the insured could "reasonably have believed about the seriousness of [the] injury and [its] liability for it," and (3) what the insured could "reasonably have believed about the likelihood of a claim being made against [it]."  *Id.* at 983; *see also Diamond Serv. Co.*, 476 A.2d at 653 (applying the *Starks* court's "three-part test to determine whether an insured's delay in notifying [its] insurance company of an occurrence was reasonable").

Before turning to the individual factors, UIP urges that whether its reporting delay was reasonable or not is a jury question that cannot be resolved on summary judgment.  Defs.' Opp'n at 1–2, 26.  Not so.  "Reasonableness will often be a question for the jury, but where, as here, the evidence as to timing is uncontradicted, reasonableness of the delay may become a question of law."  *Greycoat*, 657 A.2d at 768.  As demonstrated below, the facts here are not in dispute, and so the court can decide the reasonableness of UIP's delay as a matter of law.

As to the first *Starks* factor—what UIP reasonably could have believed its obligations under the 2018 Policy were—UIP argues that "it was unaware of the potential for coverage . . . until on or about February 2019" and this ignorance means that its notice was reasonably timely. *See* Defs.' Opp'n at 26–27. Zurich counters that the relevant inquiry is whether UIP was aware of its notice obligations—not the availability of coverage—and that UIP's subjective beliefs regarding its policy coverage are irrelevant to what a reasonable person would believe its obligations were. *See* Pl.'s Reply Br. at 18–19.

Both parties' framings of the relevant inquiry on this first factor miss the mark. The D.C. Court of Appeals has instructed that the first factor looks to "whether the insured should have perceived the" occurrence—here the filing of three lawsuits—"to be a reportable occurrence within the meaning of the policy." *Diamond Serv. Co.*, 476 A.2d at 653. Whether an incident is a reportable occurrence turns on whether the incident was "'sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages.'" *Id.* (quoting *Starks*, 408 A.2d at 983). In considering this question, the D.C. Court of Appeals has recognized that "[a]n insured is held to know the contents of his policy." *Id.* at 653 n.8. Accordingly, the question before the court is whether a reasonable person, knowing the contents of the 2018 Policy, would have believed that Marion Coster's lawsuits would give rise to a claim for damages.

On that score, once the lawsuits were filed, a reasonable person would have recognized that the lawsuits not only could have given rise to a claim for damages under the Policy, but actually did do so. While the Custodian Action and Stock Action primarily seek equitable relief, Marion Coster also requested attorneys' fees and costs in both actions, *see* Custodian Action Compl. at 14; Stock Action Compl. at 13, which are recoverable under the 2018 Policy. *See* 2018

Policy at 28, art. III, § E ("Loss means the *total amount* the Insureds become legally obligated to pay on account of Claims made against them for Wrongful Acts . . . ." (emphasis added)).   In addition, the 2018 Policy provides for UIP to recoup its own attorneys' fees and costs, regardless of whether a suit seeks damages.  *See id.* at 14, art. II, § E (defining "Defense Costs," which include "reasonable costs, charges, fees (including but not limited to attorney's fees and expert's fees) and expenses" incurred in defending and investigating claims or incurred at the insurer's request); *id.* at 28, art. III, § E (defining "loss" to include "Defense Costs").   And at the very least, the Federal Action explicitly requests judgment "in an amount to be established at trial," attorneys' fees and costs, and prejudgment interest.  *See* Federal Action Compl. at 22–23.  No reasonable person could conclude that, after being served with three lawsuits, UIP was unaware of a reportable occurrence under the 2018 Policy.  The first factor thus weighs against a finding that UIP gave notice as soon as was practicable.

The second factor asks whether the alleged injury was serious enough that the insured could reasonably have believed he would face liability for it.  *See Diamond Serv. Co.*, 476 A.2d at 653. UIP argues that this factor weighs in its favor because Marion Coster did not seek monetary damages in either the Custodian Action or the Stock Action.  Defs.' Opp'n at 27.  Zurich rejects this argument, countering that Marion Coster sought monetary relief in the form of attorneys' fees in the Custodian Action and the Stock Action, that the Federal Action sought compensatory damages, and that UIP was seeking defense costs from Zurich for each of the lawsuits.  Pl.'s Br. at 19–20.

The court finds that this second factor also weighs against UIP for two reasons.  First, as Zurich argues, UIP wholly ignores that the Federal Action contains an express request for compensatory damages and that Marion Coster requested attorneys' fees in each of the lawsuits.

*See* Federal Action Compl. at 22–23; Custodian Action Compl. at 14; Stock Action Compl. at 13. Thus, UIP's contention that it faced *no* risk of a monetary judgment against it is plainly contradicted by the facts before the court. Second, to the extent that UIP argues that Marion Coster's claims were too trivial to trigger coverage under the Policy because the lawsuits did not request monetary damages, that claim also fails. While some courts have "excused late notice when there apparently was no injury . . . and no reasonable ground for believing that an injury might later evolve," *Starks*, 408 A.2d at 984, UIP was aware that Marion Coster was claiming an injury from UIP's conduct because she filed three lawsuits to that effect. The last of those lawsuits made clear that Marion Coster was seeking to hold UIP liable for substantial money damages. *See id.* at 985 (noting that even where a causal connection between an injury and the insured is weak, the insured is still "obliged to notify the insurance company" at the point when she "reasonably should have known the claim was coming"); *Diamond Service Co.*, 476 A.2d at 653 n.11 (similar).

Finally, UIP gains no ground on the third factor—what it could "reasonably have believed about the likelihood of a claim being made against [it]." *Stark*, 408 A.2d at 983. UIP argues that it was "unfathomable" that Marion Coster would file suit against it. Defs.' Opp'n at 28. Zurich disagrees, arguing that UIP *knew* that there was a claim being made against it because it had already been sued. *See* Pl.'s Reply at 21–22.

The court again agrees with Zurich. At the time UIP was served with the complaints in Marion Coster's three actions, it knew a claim was being made against it. UIP's argument that it was "unfathomable" that Marion Coster would sue describes UIP's position at the time that it received the written communications preceding the lawsuits that Zurich argues were Claims—not UIP's position after it was served with Marion Coster's lawsuits. Those communications are irrelevant here, as all of them would have required UIP to give notice under the 2017 Policy. The

only events that would have required UIP to give notice to Zurich under the 2018 Policy are the filing of the Custodian, Stock, and Federal Actions. And as to those lawsuits, once UIP was *actually* sued, it could not hold any reasonable belief other than that there was a 100% likelihood that a claim would be made against it. *See Greycoat*, 657 A.2d at 769 (finding third factor weighed against finding of timely notice where insured knew "that it was actually being sued"). The third factor therefore supports a finding that UIP failed to give Zurich notice as soon as was practicable.

UIP has failed to show that any of the *Starks* factors justify its delay of seven to nine months in providing notice of Marion Coster's lawsuits to Zurich. In a comparable situation, the D.C. Court of Appeals has held as a matter of law that notice was not given as soon as was practicable after the insured delayed just five months in providing notice. *See id.* ("Greycoat, giving notice more than five months later, simply waited unreasonably long from that date" to give notice).[8] Accordingly, the court concludes that no reasonable jury could find that UIP gave Zurich notice of Marion Coster's lawsuits as soon as was practicable, and Zurich is not obligated to provide coverage to UIP for those lawsuits under the 2018 Policy.

### 2.    Whether Zurich Must Show Prejudice Arising from the Late Notice

Having found that UIP's notice was untimely under the 2018 Policy, the court must answer one last question. UIP argues that the failure to provide timely notice is, in some cases, insufficient for an insurer to deny coverage. *See* Defs.' Opp'n at 28–31. UIP urges that an insurer is required to show prejudice when notice is untimely but still falls within the policy reporting period.

---

[8] UIP argues that *Greycoat* is inapplicable here because the policy at issue required the insured to provide immediate notice of any suit filed against the insured. Defs.' Opp'n at 27. However, "courts interpret a requirement of immediate notice to require notice within a reasonable period of time." *Wash. Sports & Ent. Inc. v. United Coastal Ins.*, 7 F. Supp. 2d 1, 12 (D.D.C. 1998). That is the same standard applied to notice provisions that require notice as soon as practicable. *See, e.g.*, *Greenway*, 307 A.2d at 755 ("The words 'as soon as practicable' have uniformly been held to mean within a reasonable time in view of all the facts and circumstances of each particular case.").

So, here, UIP insists that, because it gave notice of the lawsuits within the 90-day reporting period, Zurich cannot deny coverage absent prejudice arising from the delay, which Zurich has not shown. The court finds no merit to UIP's argument.[9]

"The District of Columbia Court of Appeals . . . has been clear that an insurer is not required to demonstrate actual prejudice before denying coverage on the basis of an insured's failure to comply with a contractual notice provision." *Nat'l R.R. Passenger Corp. v. Lexington Ins.*, 445 F. Supp. 2d 37, 43 (D.D.C. 2006) (citing *Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins.*, 657 A.2d 764, 768 n.3 (D.C. 1995)).  In *Greenway v. Selected Risks Insurance*, which also involved an insured's failure to provide notice of a claim "as soon as practicable," the D.C. Court of Appeals concluded that its previous decisions "make[] it abundantly clear that actual prejudice to the carrier is not a necessary element in the defense raised here."  307 A.2d 753, 754, 756 (D.C. 1973); *see also Waters v. Am. Auto. Ins.*, 363 F.2d 684, 686, 690 (D.C. Cir. 1966) (considering insurance policy that required notice "as soon as practicable" and concluding insurer had no obligation "to establish that it was prejudiced by th[e] delay in receiving notice"); *Greycoat*, 657 A.2d at 768 n.3 (noting D.C. law had "explicitly rejected" a requirement that the insurer make "a showing of prejudice . . . in order for a late-notice defense to prevail").  UIP has not identified any decision in the District of Columbia requiring the insurer to show prejudice from the insured's delayed notice or even calling the District's no-prejudice rule into question, and the clear weight of authority disclaims UIP's position.

---

[9] This argument implicates the analysis with respect to the 2018 Policy only.  UIP otherwise concedes that an insurer need not show prejudice under D.C. law to disclaim coverage when notice is given after a claims-made insurance policy expires.  *See* Defs.' Opp'n at 28–29.  Because UIP gave notice long after the 2017 Policy expired, no prejudice inquiry is required as to that Policy.

Accordingly, the court concludes that, under D.C. law, Zurich is not required to demonstrate that it was prejudiced by any untimely notice under the 2018 Policy.

## V.    CONCLUSION

For the foregoing reasons, the court grants Zurich's Motion for Summary Judgment, ECF No. 25, and dismisses UIP's Counterclaim, ECF No. 12.

A separate final, appealable order accompanies this memorandum.


Dated:  February 16, 2021

Amit P. Mehta
United States District Court Judge

27